IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John R. Sherman,                          :
                  Petitioner          :        No. 65 C.D. 2023
                                        :
        v.                                  :        Submitted: October 10, 2023
                                          :
County of Mercer (Workers'                :
Compensation Appeal Board),               :
                  Respondent         :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE CHRISTINE FIZZANO CANNON, Judge

*__OPINION NOT REPORTED__*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                     FILED: November 6, 2023

        John R. Sherman (Claimant) petitions for review of the December 30, 2022 order of the Workers' Compensation Appeal Board (Board), which affirmed the decision of the Workers' Compensation Judge (WCJ), granting in part and denying in part Claimant's Claim Petition.  Upon review, we affirm.

**Factual and Procedural History**

        On May 29, 2019, while in the scope and course of his employment as a Correctional Officer with the County of Mercer (County), Claimant was accidently sprayed in his left eye with a chemical disinfectant.  On July 2, 2019, Claimant filed a Claim Petition, seeking payment of medical bills and counsel fees, for a left eye injury.  (Reproduced Record (R.R.) at 33a-35a.)  Claimant did not allege a loss of wages but reserved the right to seek wage loss and the "loss of use" of his left eye.  *Id.* at 34a.  On

June 14, 2019, the County filed a Notice of Compensation Denial, denying that Claimant sustained a work injury on May 29, 2019. *Id.* at 31a-32a.

The Claim Petition was assigned to a WCJ, who heard testimony on August 8, 2019, January 23, 2020, and May 10, 2021.

At the August 8, 2019 hearing, Claimant amended the Claim Petition to include a wage claim for the loss of the use of his left eye. *Id.* at 68a. Claimant testified that he had been employed as a full-time Correctional Officer at the County jail for approximately 11 years and part-time for approximately 2½ years before that. His duties as a Correctional Officer included custody, care, and control of inmates. His job may require him to break up fights and interact physically with inmates at times. Claimant testified that he was making his rounds and was walking toward stairs to go to the top tier cells at which time an inmate accidently sprayed him in the left eye with a chemical disinfectant. *Id.* at 72a-74a. Claimant described the solution as dark orange, but he did not know if it was diluted or not. *Id.* at 74a. Claimant experienced instant pain. *Id.* at 74a-75a. He stated it felt worse than being pepper sprayed. He was taken to the UPMC Shenango Emergency Room (ER) where he was treated with an intravenous (IV) drip into his eye. At the ER, Claimant experienced an episode of blood pressure spike of 155/85. *Id.* at 405a. At the ER, his eye was blurry, and he could not see out of it. The next day, Claimant went to Valley Eye Center because he could not see out of his left eye. *Id.* at 79a. After some examinations, he was told he was legally blind in the left eye. *Id.* at 80a. He has treated with a number of physicians. He testified that he has not been able to see out of his left eye since the incident. *Id.* at 80a-85a. Claimant stated that he wears glasses, however, he never had any problems with vision in his left eye before the incident. *Id.* at 91a. He is a diabetic and takes diabetes medication. *Id.*

Claimant was released to return to the County in a temporary light-duty position and remained on light-duty from the time the incident happened. At that time, Claimant did not think he was able to return to his regular position, as he had no peripheral vision. *Id.* at 88a-91a. Claimant described his light-duty job at the jail as sitting in front of a desk looking at a computer screen and using a mouse to open doors. He can see the screen decently, but only with his right eye. He indicated that he wanted to keep doing this job as long as it would remain available to him. *Id.* at 92a. He was concerned he would be subject to being attacked and would be unable to defend himself. Claimant was also concerned about loss of use of his right eye, and that he would not be able to see at all.

At the January 23, 2020 hearing, Deputy Warden of Security, Herman McDuffy, testified that the spray bottle in question contained a chemical product called HALT, which is used to disinfect at the facility. He confirmed that the spray bottle contained a diluted solution consisting of 1 part disinfectant to 16 parts water. *Id.* at 158a. Deputy Warden McDuffy testified that an inmate and another staff member were accidentally sprayed in the eye with the diluted solution, and they were taken to have their eyes flushed in the jail's medical department with no other treatment or side effects. *Id.* at 152a.

Claimant presented the deposition testimony of his treating optometrist, Randy Kerr, O.D., who testified that a normal optic nerve typically looks a salmon color, and Claimant's nerve was chalky white, which is an indication that something happened to the blood supply to the nerve resulting in it being deteriorated. *Id.* at 232a-33a. Dr. Kerr's diagnosis was a non-arteritic ischemic optic neuropathy brought on by a significant blood pressure spike. He believed that this blood pressure spike was caused by the HALT sprayed into Claimant's eye. *Id.* at 238a. Dr. Kerr opined that

3

the solution sprayed in Claimant's eye caused his blood pressure to spike, resulting in his optic nerve to becoming ischemic because there was "no other explanation for what happened with his optic nerve in the left eye." *Id.* at 241a, 409a, 412a, 417a. Dr. Kerr confirmed that there was no scarring of the cornea to suggest a chemical burn. *Id.* at 253a. He did not believe that the HALT exposure itself caused Claimant's loss of vision. He did not believe Claimant could return to work at his regular-duty position. On cross-examination, Dr. Kerr opined that non-arteritic anterior ischemic optic neuropathy is a fairly common condition, even without any trauma to the eye. *Id.* at 250a. He acknowledged that common risk factors include diabetes and hypertension, and agreed that Claimant had a history of diabetes and hypertension for which he was taking several medications. *Id.* at 250a-52a. Dr. Kerr believed Claimant's blood pressure at the ER was 200/100, and he based that understanding on what Claimant told him. *Id.* at 253a-54a. Prior to his deposition, he had never seen a medical record from the ER indicating what exactly Claimant's blood pressure was at the ER. *Id.* at 255a-56a. When shown the ER record, which showed Claimant's blood pressure was 155/85, Dr. Kerr agreed that the cutoff for a hypertensive crisis was 160/120, and that Claimant's blood pressure at the ER fell below that classification. *Id.* at 256a, 413a-14a. He acknowledged a documented blood pressure reading on August 10, 2019, of 147/96, which he conceded would be classified as high blood pressure.

Employer presented the deposition testimony of Jeffrey Karlik, M.D., an ophthalmologist who performed an independent medical examination of Claimant on October 17, 2019. Dr. Karlik found no evidence of any chemical or caustic burn upon his examination of Claimant's left eye, meaning he saw no ocular, corneal, or eyelid scarring. *Id.* at 335a. He opined that Claimant had visual compromise secondary to optic atrophy or degeneration of the optic nerve in the left eye. *Id.* at 336a, 343a. He

4

explained that optic atrophy can result from a number of things, including trauma to the eye, tumor, pressure of the optic nerve from a mass, pressure from inflammation, and inflammatory disorders such as optic neuritis, infarction like a stroke, or a stroke on the optic nerve head. *Id.* at 35a. He opined that the atrophy of Claimant's optic nerve was most consistent with an interruption of blood flow to the optic nerve head, although he did not know the exact time that the presumed anterior ischemic optic neuropathy occurred. *Id.* at 335a-36a, 356a. He came to this conclusion due to the appearance of the optic nerve being pallor. *Id.* at 349a-50a. He explained that Claimant had a "tight disc" or smaller optic nerve, and that a smaller optic nerve is more prone to this type of ischemic injury. *Id.* at 343a. He also testified that people with hypertension have a predisposition to an anterior ischemic optic neuropathy. *Id.* at 353a. He found no evidence of a chemical injury playing any role in the optic atrophy. *Id.* at 337a-38a. Although he agreed that getting sprayed in the eye with a chemical is the type of traumatic event that could cause someone's blood pressure to spike, Dr. Karlik disagreed with Dr. Kerr's opinion that the left optic nerve infarction was secondary to a blood pressure spike because his blood pressure at the ER was far from a hypertension crisis. *Id.* at 340a-42a. He added that Claimant was predisposed toward ischemic optic neuropathy due to his history of hypertension. Dr. Karlik agreed that Claimant arrived at the ER two hours after the exposure to the chemical, however, there was no way for him to confirm that Claimant's blood pressure spiked at the jail right after the chemical was sprayed in his eye. *Id.* at 358a-59a. Dr. Karlik was also asked on cross-examination if Claimant suffered from any loss of vision in his left eye prior to the incident at work, and he confirmed that he was not aware of any such issue. *Id.* at 355a-56a. He was then asked what caused the optic atrophy in the Claimant's eye and his answer was: "Presumably, it is an interruption of the blood flow to the optic

nerve head." *Id.* at 356a. When asked when it happened, his answer was: "It may have happened before the splash injury, for all I know. I mean, I really don't know." *Id.*

Jennifer Hamilton, the Human Resources Director for the County, testified that Claimant's light-duty position was only temporary, and that there are no permanent light-duty positions at the jail. *Id.* at 457a-58a. Ms. Hamilton sent a letter to Claimant advising him that his employment was terminated because there were no permanent light-duty positions at the jail.

### WCJ's Findings of Fact/Board's Affirmance

As to Claimant, the WCJ found his testimony credible in part. He credited Claimant's testimony describing the incident and his description of his vision issues. (Finding of Fact (FOF) 27.) He did not accept Claimant's assertion that the substance sprayed into his eye was undiluted, or that Claimant had a blood pressure spike causing damage to his optic nerve and the loss of vision of the left eye because "there was no evidence of a spike in blood pressure to corroborate that aspect of Claimant's testimony. It is not documented in history nor in readings taken." *Id.*

As to Dr. Kerr, the WCJ did not find credible Dr. Kerr's opinion that a sufficient spike in blood pressure occurred due to the incident such that it caused the loss of vision in the afflicted eye. The WCJ explained the basis of his determination as follows:

> The records show the blood pressure was recorded on the date of injury as 155/85, but no prescription or treatment was offered for any alleged spike in blood pressure. There is no corroborating evidence of a spike to a level of 200/100, and there is no record of blood pressure levels pre-injury for comparison. In addition, while Dr. Kerr stated in his first deposition that 160/100 or 160/120 would be considered a hypertension crisis, in the second deposition he basically suggested the blood pressure reading of 155/85 was enough.

Further, he acknowledged that diabetes can be a cause of such vision loss, and Claimant was documented as being a diabetic and that he took medication for his condition. As a result of the above considerations, it is certainly not credible to make such a causal connection to the HALT splash incident, and one could argue it is speculative. I deem it as an issue going to the weight of the testimony, and I reject Dr. Kerr on this causation issue.

(FOF 28.)

As to Dr. Karlick, the WCJ found his testimony to be credible and convincing to establish that Claimant sustained vision loss in the affected left eye, but that loss of vision was not due to being sprayed in the eye with HALT, or any alleged blood pressure spike that was related to being sprayed in the eye with HALT. The WCJ found that Dr. Karlick credibly stated that there was no evidence of direct injury to the optic nerve from the HALT exposure or that any such exposure caused a blood pressure spike. (FOF 29.) In crediting Dr. Karlick's opinion, the WCJ found

the records fail to show much change between the date of injury and the blood pressure reading two months later in July. In fact, diastolic was higher in July of 2019. The records show a blood pressure of 131/92 on May 30, 2019, yet it rose, as seen above, in August of 2019. The implication is that occasional elevation is not due to the claimed injury. For these reasons, Dr. Karlick is credible regarding causation.

*Id.*

Based on his credibility determinations, the WCJ specifically rejected "any contention that Claimant lost vision or suffered a loss of vision for all practical intents and purposes in the left eye due to chemical exposure to HALT or due to elevation in blood pressure from such exposure or its treatment." (FOF 32.) The WCJ granted the Claim Petition to award medical benefits only, finding that Claimant

7

sustained a temporary non-disabling eye injury. Claimant appealed to the Board, arguing that the WCJ erred in not granting his Claim Petition for the loss of the use of his left eye because the totality of the record supported a work-related loss.

On December 30, 2022, the Board affirmed.

## Issue

Claimant argues that the WCJ and Board erred in failing to grant his Claim Petition for the loss of the use of his left eye due to the work injury. He contends that the medical opinions of both Dr. Kerr and Dr. Karlik, when reviewed "in their totality," support that the work injury resulted in the loss of the use of his left eye. (Claimant's Br. at 19.) He argues that the Supreme Court in *City of Pittsburgh v. Workers' Compensation Appeal Board (Robinson)*, 67 A.3d 1194 (Pa. 2013), held the "totality of the circumstances" must be considered in a workers' compensation case.

He argues that when examining the medical opinions of both Dr. Kerr and Dr. Karlick in their totality, they demonstrate, "by the process of elimination," that the only possible explanation for the loss of the use of his eye, and the destruction of the optic nerve, was the hypertensive event at the ER. (Claimant's Br. at 18, 22.) He argues that Dr. Karlick conceded that there were no other possible etiologies besides a spike in blood pressure. He further argues that because he was able to see out of his left eye right before the work-related incident and lost his vision in that eye right afterwards, there was in fact an "obvious causal connection" between these two events. *Id.* at 22. Claimant contends that Dr. Karlick focused on his blood pressure recorded two hours after the incident at the ER and refused to even entertain the possibility that an unrecorded blood pressure spike may have occurred in this matter immediately after Claimant was splashed in the eye with a caustic chemical. He asserts that this type of inconsistency renders Dr. Karlick's testimony incompetent as a matter of law. Based

8

on these arguments, Claimant contends that the WCJ and the Board erred in failing to grant him benefits for loss of the use of his left eye.

**Analysis**

The WCJ has complete authority over questions of credibility, conflicting medical evidence, and evidentiary weight. *Sherrod v. Workmen's Compensation Appeal Board (Thoroughgood, Inc.)*, 666 A.2d 383 (Pa. Cmwlth. 1995). The WCJ is free to accept or reject, in whole or in part, the testimony of any witness. *Lombardo v. Workers' Compensation Appeal Board (Topps Company, Inc.)*, 698 A.2d 1378 (Pa. Cmwlth. 1997). This Court may not reject a WCJ's credibility determinations on appeal or make new findings of fact based upon the evidence in the record. *Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043 (Pa. 2003); *Universal Cyclops Steel Corporation v. Workmen's Compensation Appeal Board (Krawczynski)*, 305 A.2d 757 (Pa. Cmwlth. 1973).

Whether there is substantial evidence to support an award is an issue of law reviewable by this Court based on the entire record. *Leon E. Wintermeyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 812 A.2d 478 (Pa. 2002). Substantial evidence has been defined as such relevant evidence that a reasonable mind might find adequate to support a conclusion based on the findings of fact. *Gibson v. Workers' Compensation Appeal Board (Armco Stainless & Alloy Products)*, 861 A.2d 938 (Pa. 2004). In determining whether there is substantial evidence to support the findings of a WCJ, the evidence must be reviewed on appeal in the light most favorable to the party that prevailed before the WCJ. *Id.* We must give all reasonable inferences, which are deducible from the evidence, in support of the WCJ's decision in favor of that prevailing party. *Wawa v. Workers' Compensation Appeal Board (Seltzer)*, 951 A.2d 405 (Pa. 2008). In addition, where both parties present evidence, it does not

9

matter that there is evidence in the record which supports findings contrary to those made by the WCJ, rather the pertinent inquiry is whether there is any evidence which supports the WCJ's factual findings. *Lochner v. Workers' Compensation Appeal Board (City of Johnstown)*, 782 A.2d 35 (Pa. Cmwlth. 2001).

In a claim petition, a claimant has the burden of proving all of the necessary elements to support an award including the existence of an injury, subsequent disability, and its duration. *Inglis House v. Workmen's Compensation Appeal Board (Reedy)*, 634 A.2d 592 (Pa. 1993). Where there is no obvious causal connection between an incident at work and subsequent injury, unequivocal competent credible medical evidence is necessary to establish a causal relationship. *Jeannette District Memorial Hospital v. Workmen's Compensation Appeal Board (Messick)*, 668 A.2d 249 (Pa. Cmwlth. 1995).

Here, the WCJ did not find the opinions of Claimant's medical expert credible on the issue of the cause of the loss of use of the left eye and instead found the opinions of Dr. Karlik credible on that issue. Dr. Karlik testified that Claimant's loss of eyesight was due to anterior optic neuropathy which was unrelated to the chemical splash at work or to any alleged hypertensive crisis immediately following the chemical splash. As the Board correctly noted, Claimant was required to establish this connection by unequivocal credible medical evidence, not by way of "process of elimination," and clearly failed to do so stating: "[w]e cannot agree that the connection between a hypertensive event, if there was such an event, and a loss of blood flow to the optic nerve is so clear that an untrained layman would make the connection." (R.R. at 557a.) Claimant's criticisms of Dr. Karlik's opinions are in reality an attack on the WCJ's credibility determinations, which are not subject to review on appeal. Credibility determinations are solely within the discretion of the WCJ and are not

10

reviewable on appeal. *Universal Cyclops*, 305 A.2d at 757. Therefore, we conclude that the WCJ's Decision is supported by substantial competent evidence.

The order of the Board is affirmed.


                _____

                PATRICIA A. McCULLOUGH, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John R. Sherman,  :
            Petitioner  :   No. 65 C.D. 2023
                 :
         v.  :
                 :
County of Mercer (Workers'  :
Compensation Appeal Board),  :
            Respondent  :

### *<u>ORDER</u>*

AND NOW, this 6th day of November, 2023, the December 30, 2022 order of the Workers' Compensation Appeal Board is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge